## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Alon Kahana, M.D., Ph.D., an individual,

      Plaintiff,                      File No.
                                      Hon.
v.                                   Magistrate

Consultants in Ophthalmic & Facial Plastic
Surgery, P.C., a Professional Corporation,
Evan Black, M.D., an individual,
Frank Nesi, M.D., an individual, and
Does 1 through 10,

      Defendants.
_____/

Angela L. Jackson (P53930)
HOOPER HATHAWAY, P.C.
126 South Main Street
Ann Arbor, MI  48104
(734) 662-4426
ajackson@hooperhathaway.com
Attorney for Plaintiff
_____/

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff Alon Kahana, M.D., Ph.D., by and through counsel,

Hooper Hathaway, P.C., and for his Complaint against Defendants Consultants in

Ophthalmic & Facial Plastic Surgery, P.C., Evan Black, M.D., Frank Nesi, M.D. and

Does 1 through 10, states as follows:

## **PARTIES**

1.      Plaintiff Alon Kahana, M.D., Ph.D. ("Plaintiff" or "Kahana") is an individual residing in Washtenaw County, Michigan, and is a former employee of Defendants.

2.      Consultants in Ophthalmic & Facial Plastic Surgery, P.C. ("COFPS") is a Michigan Professional Corporation that has offices in Wayne, Genesee, and Oakland Counties.

3.      Evan Black ("Black"), M.D. is an individual working in Wayne, Genesee, and Oakland Counties, Michigan, and is the managing partner of COFPS.

4.      Frank Nesi ("F. Nesi"), M.D. is an individual working in Wayne, Genesee, and Oakland Counties, Michigan, and is an officer and director of COFPS.

5.      Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10, inclusive, or any of them, and therefore sues these Defendants, and each of them, by such fictitious names. The Doe defendants include persons and entities assisting or acting in concert with the named Defendants in connection with the actions complained of herein and include persons and entities that are responsible in some manner for the acts, occurrences and liability hereinafter alleged and referred to.

6.      Defendants COFPS, Black, F. Nesi and Does 1 through 10 are collectively referred to below in this Complaint as "Defendants."

2

7.      Defendants are employers as defined by and subject to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*

8.      Plaintiff is informed and believes that at all times, Defendants, and each of them, were the agents, employees, and officers of each of the remaining Defendants, and in doing the things alleged, were acting within the scope, course and purpose of such agency and employment, or within the apparent scope of such agency or employment, and with the permission and consent of each of the remaining Defendants.

9.      At all times during the Plaintiff's employment with Defendants, Plaintiff was Defendants' employee within the meaning of the FLSA, 29 U.S.C. § 203(e).

10.     At all relevant times, Defendants met the requirements of an employer defined by Michigan's Improved Workforce Opportunity Wage MCLS 408.933.

## **JURISDICTION AND VENUE**

11.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. §1331, because Plaintiff has brought a claim pursuant to the federal Fair Labor Standards Act, 29 U.S.C. §201 *et. seq.*  The Court also has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 as this is the judicial district in which the unlawful employment practices occurred and the relevant employment records are kept.

13.     At all relevant times, Defendants were engaged in interstate commerce and had an annual gross volume of business not less than $500,000.

## FACTS COMMON TO ALL CAUSES OF ACTION

14.     Plaintiff Kahana is an Oculoplastic surgeon and researcher who is among the top people in his field and was a tenured professor at the University of Michigan until he was recruited to join Defendant COFPS in the fall of 2019. Kahana performs surgeries that few people can perform, including facial reconstruction with a focus on orbital disease and pediatric oculoplastic surgery. Kahana often works on the hardest cases, including repairing complications from failed surgeries, including cosmetic surgeries. At the University of Michigan, Kahana also had a lab where he did research, including with respect to ways to improve surgical outcomes and prevent birth defects. Currently, he is Vice-Chair for Academic Affairs in the Department of Ophthalmology at Oakland University's William Beaumont School of Medicine, where he teaches residents and medical students, and pursues clinical research to improve patient care.

15.     For several years, Black, the managing partner of COFPS whom Kahana considered his friend, had tried to convince Kahana to leave the University

4

of Michigan and join their practice. In his words, it would be a great fit, since Kahana would be able to perform the complex eyelid and orbital surgeries, as well as take care of children with congenital oculoplastic conditions, and that would free the other surgeons in the practice to do the more lucrative, but often more straight forward, cosmetic surgeries. It would also elevate the quality of training of their affiliated trainees (fellows, residents, medical students) by enhancing their exposure to, and participation in, the treatment of patients with complex oculoplastic and orbital disorders.

16.     At the American Society of Ophthalmic Plastic & Reconstructive Surgery, Inc. ("ASOPRS") meeting on October 11, 2019, F. Nesi and Black succeeded, and Kahana verbally agreed to join their practice. F. Nesi and Black told Kahana that he would be able to join COFPS as a partner, and Black represented that there would be no buy in and no restrictive covenant. This was reaffirmed in several in-person and telephone conversations.

17.     Based on the representations made by Black and F. Nesi, Kahana gave formal notice in writing to the University of Michigan on November 4, 2019 that he would forgo his tenured faculty position and resign. Kahana also contacted the ASOPRS organization on November 11, 2019 about his impending move to COFPS, requesting permission to allow his ASOPRS fellow to move with him to the new practice.

18.    Kahana would not have taken these steps to move his fellow to COFPS and give notice to the University of Michigan if Black and F. Nesi had not represented to him that partnership at COFPS would not include a buy-in, and that a partnership track would follow a predetermined clinical revenue schedule that was discussed during phone conversations between Kahana and Black in October and November 2019. Black made it clear to Kahana that there was no risk to him – if he decided to leave COFPS, there would be no restrictive covenant. In addition, Black and F. Nesi represented that they would support Kahana's ASOPRS-approved fellow, hire the two Physician Assistants who worked with him at the University of Michigan, and set him up to become a productive oculoplastic surgeon in their practice. They also promised a "massive" marketing campaign, in the words of F. Nesi.

19.    On November 17, 2019, Kahana had a formal meeting with all of the partners at COFPS, and they all agreed that Kahana would join COFPS, and the partners shook hands with Kahana.

20.    On December 1, 2019, Dr. Geoffrey Gladstone wrote to Kahana: "I am really excited that you have joined us."

21.    On December 13, 2019, Kahana received a draft employment agreement from Josh Nesi ("J. Nesi"), the business manager of COFPS. The terms of this proposed employment agreement were contrary to what Black and F. Nesi

had represented to him, but Kahana had already resigned from his tenured position at the University of Michigan and transferred his fellow to COFPS. Kahana did so to his detriment in reasonable reliance on what Black and F. Nesi had represented to him.

22.     Kahana immediately called Black to discuss the draft employment agreement. Black told Kahana on December 14, 2019 that he did not look at the contract carefully, that he agreed that the contract sent to Kahana was not consistent with what he had represented to Kahana, and that he accepted all of Kahana's revisions. Black represented that the contract would be revised to reflect the actual agreement, and that Kahana would receive equity partnership with no buy in.

23.     After talking with Black, Kahana sent a response email to J. Nesi recapping what he had told Black, and what Black had represented:

1) The practice should not own my inventions.
2) I should be able to consult, invent, do research, teach, etc., to my heart's content. What I can't do is moonlight - I shouldn't be able to practice medicine outside of COFPS. But otherwise, you should let me be.
3) If I leave, I should be able to take my team and my patients. Otherwise it's a backdoor restrictive covenant, and I know that this was not the intention.
4) Once I pay off my loan, I should become an equity partner with ownership in the Employer. That was what we had discussed, most recently at the dinner in Bloomfield. I'm going to create a lot of business, and I should be able to share in the profits.
5) Just as Employer can terminate me if I don't abide by my obligation, I should be able to "terminate" the relationship if Employer doesn't abide by obligations.
6) Any issues should be addressed by arbitration, not litigation.
7) The overall goal of this contract is to guide us through a transient employee period with the expectation that I will quickly become a partner and enter a

partnership agreement rather than an employee agreement. Hence, the outline of the partnership agreement should be part of the Employment agreement. (**Exhibit 1**).

24.     Based on Black's representations, Kahana continued to transition from the University of Michigan to COFPS. Kahana left the University of Michigan and joined COFPS in February 2020. Dr. Kahana held his first clinic in the COFPS Livonia office on Wednesday, February 12, 2020.

25.     On January 28, 2020, Kahana finally received the revisions, and once again, it was not at all what had been represented to Kahana. However, in reliance on the representations previously made, Kahana had already left his tenured position at the University of Michigan. Kahana protested that this was inconsistent with the representations by F. Nesi and Black and was told in subsequent in-person and phone conversations, as well as in an email from J. Nesi, that he had no choice but to "take it or leave it."

26.     In an email dated February 13, 2020, J. Nesi wrote:

There is no point in arguing any of the points your attorney brought up in the contract, we absolutely will not change a thing at this juncture. We have presented you with the final contract. That's all we're willing to give . . . we have made our best offer, you can take it or leave it. The terms of this contract could have been done in under a page in layman's terms; You are welcome to join our practice, you are welcome to become a partner provided you hit financial benchmarks and the partners believe you are an asset, you can leave whenever you want and take your employees and we will notify the patients you have seen that they can follow you if they like. **There is no non-compete. There are no restrictions put on**. (emphasis added) (**Exhibit 2**).

27.    Kahana had already concluded his secure employment and tenured status at the University of Michigan, had already started working at COFPS, and after additional discussions with J. Nesi, reluctantly signed the Employment Agreement on or about March 17, 2020 (the "Employment Agreement"). (**Exhibit 3**). This bait and switch happened just as the Covid-19 pandemic was starting. Kahana had no other source of income and had already started working at COFPS. Moreover, Kahana had already resigned from the University of Michigan and was therefore ineligible for unemployment benefits. This bait and switch left Kahana in an impossible position with four children and a family to support. Attached hereto as Exhibit 3 is a true and correct copy of the Employment Agreement.

28.    On March 28, 2020, Kahana was furloughed by COFPS as a response to the Covid-19 pandemic, and in breach of his Employment Agreement. Dr. Kahana was not paid, but out of a sense of obligation to patients, continued to take calls and took care of patients with cancer, trauma and Covid-related complications at William Beaumont Hospital (Royal Oak), Children's Hospital of Michigan (Detroit), and St. Mary Mercy Hospital (Livonia). Kahana was eventually rehired by COFPS and advanced a salary in anticipation of obtaining funds through the PPP program.

29.    While starting work at COFPS just as the Covid-19 pandemic was causing shutdowns was difficult, Kahana became quite busy surgically within a few months and did well financially for the practice, as acknowledged by F. Nesi and

others at COFPS. On December 31, 2020, F. Nesi wrote "100k! Congrats!" This referred to the practice collecting $100,000 in a single month for work performed by Kahana. (**Exhibit 4**).

30.     On May 2, 2021, F. Nesi wrote to Kahana: "There is no one who is more appreciative or has a clearer understanding really of what you've accomplished in only one year[.] From my point of view it's been phenomenal." (**Exhibit 5**).

31.     During a meeting of the Michigan Society of Eye Physicians and Surgeons on Mackinac Island on July 9, 2021, Black told Kahana that the Employment Agreement was "not being followed" by COFPS and "invalid."

32.     The Employment Agreement contained numerous provisions that COFPS breached, including:

- Refusing to pay Kahana wages due, including for collections received in December 2021, January and February 2022, and thereafter. COFPS continues to receive money from insurance for work performed by Kahana but is pocketing all of it.

- Refusing to "provide and maintain or cause to be provided and maintained such facilities, equipment, clerical and other employees and supplies as it deems necessary for the performance of services by Employee under this Agreement. Employer agrees to provide any surgical instruments Employer deems necessary not provided by any hospital in which Employee performs

10

surgery on behalf of patients of Employer. Employer and Employee may reach a consensus about the items necessary to conduct Employee's practice prior to reaching this Agreement as attached on Exhibit C."

- Refusing to provide accounting or backup support for the calculation of what COFPS owes Kahana. COFPS is even unwilling to provide the Billings and Collections report showing how much has been collected for work performed by Kahana.

- Refusing to pay the employees listed on Appendix B, thus forcing Kahana to pay them out of his own pocket. And when COFPS did pay them, COFPS calculated this as an additional expense beyond the 55% "overhead" calculation, in direct contradiction of the Employment Agreement.

- Not providing a loan, as required under Section 1, despite having Kahana sign a Promissory Note.

- Refusing to make Kahana eligible for partnership upon hitting his benchmarks, as required by Section 13.

- Refusing to provide the items listed in Exhibit C, including the failure to pay the P.A. Salary base or for the P.A. Staffing, removing Kahana from the website, and failing to include Kahana in Mailings/Marketing.

- Failing to provide Kahana with personnel support, despite charging for overhead.

33.     On May 28, 2020, F. Nesi texted Kahana regarding the loan promised to him, stating that "I met with one of our bankers[.] They will let us amortize your loan over the ten years I wanted[.] No prepayment penalty[.] Josh will calculate and let you know[.]" Despite this representation, J. Nesi never provided the amortization calculation and Kahana never received a loan. (**Exhibit 6**).

34.     On August 8, 2020, after Kahana had already been working at COFPS for over 6 months, Kahana was provided with a "Secured Promissory Note" for $250,000 at 4.25% interest "per annum compounded monthly" (the "Note"). (**Exhibit 7**). The Note stated specifically that "Principal and Interest shall be paid in amortizable amounts for one hundred twenty (120) months." At the top of the Note it stated that this was "Exhibit A to Employment Agreement." Attached hereto as Exhibit 7 is a true and correct copy of the Secured Promissory Note.

35.     Kahana signed the Note expecting to receive $250,000. However, Kahana never received any loan from COFPS, and was never provided with an amortization schedule for repayment. This was a breach by COFPS of the Promissory Note and Employment Agreement.

36.     On or about September 12, 2020, Kahana had the following text exchange with F. Nesi (**Exhibit 8**):

| | |
|---|---|
| Kahana: | At 83k x 6 months, I become partner. In first year. The bench mark is lower in subsequent years… |
| F. Nesi: | I thought at that point you get to buy in? |
| Kahana: | No buy in. |

| F. Nesi: | Not what they're telling me |
|---|---|
| . . . | |
| Kahana: | There's no buy in in the contract. And verbally both Evan and Josh affirmed it. And I have emails supporting that. |
| . . . | |
| F. Nesi: | If that what they agreed to then that's what will most likely happen |
| Kahana: | We need to clarify for sure. I'm a bit unnerved now. I had total trust. Am I naïve? |
| F. Nesi: | Moot point I guess[.] No please don't be concerned[.] I would never interfere in this [if] that's what's been agreed to |

37.     On September 12, 2020, Kahana and F. Nesi also texted regarding a physician's assistant ("P.A.") that Kahana brought to the practice from the University of Michigan, and which COFPS had furloughed during Covid-19, and then planned to terminate rather than rehire, thus forcing Kahana to pay her out of his own pocket. F. Nesi explained his position as follows: "Frankly (and this is P&C) **I don't understand predicating so much on an employee that can be replaced**. To borrow this money, to mortgage your home when we offered to take over her salary is beyond my comprehension[.]" (emphasis added). F. Nesi was not suggesting that COFPS pay the P.A., since COFPS had already stopped paying her. What he was suggesting is that Kahana should also not pay her because she can be "replaced." (**Exhibit 9**).

38.     To this, Kahana responded: "I spent years training her. She can read my mind. She's almost irreplaceable. And **she left UM for me. She's loyal. I'm loyal too**." (emphasis added) *Id.*

13

39.     Following up on this conversation, Kahana and COFPS agreed to the

following, as summarized in an email to J. Nesi on September 25, 2020. (**Exhibit**

**10**):

> I haven't received a follow up, so would like to summarize my
> understanding of our meeting on Monday Sept. 14.
>
> 1.  We're going to return to our original arrangement, as outlined in my
>     contract, with COFPS covering the base salary of Sara Turner and
>     splitting her revenues with her. The practice will work with Sara on
>     identifying more clinic opportunities for her to build her practice.
>     [This was necessary because COFPS had stopped paying Turner,
>     thus forcing Kahana to personally pay her].
> 2.  My overhead will be decreased to 55%.
> 3.  We're going to make an immediate push for an Ann Arbor clinic
>     location and working to extend the reach of our practice west.
> 4.  We're going to make an immediate push to advertise, especially in
>     the Ann Arbor market and further west.
> 5.  COFPS is extending to me a credit line in case I require additional
>     income/cash flow while building my practice.
>
> Anything I'm missing/forgetting?

40.     To this, J. Nesi responded: "Oh yes, sorry Doc, like I said I fell behind

this week due to health issues." *Id.* After that time, Kahana received 45% of his

collections, and not 40%. COFPS is now claiming that this was never agreed to, and

that the additional amount paid to Kahana is part of the "loan" that Kahana needs to

repay.

41.     On Wednesday July 14, 2021, Kahana and F. Nesi met in the Livonia

office to discuss his pending partnership. F. Nesi agreed to make this a priority for

an upcoming meeting of the partners. He further told Kahana (not for the first time)

14

that in his 40+ years of practice, he never knew anyone to be able to have a practice dedicated to complex oculoplastic, orbital surgery and pediatric oculoplastic that could make money, and that Kahana is the first and only one he knows of. He congratulated Kahana and told him that his practice alone is probably worth $10 million if it were to be bought out by a private equity firm.

42.     As late as November 2, 2021, COFPS and F. Nesi were acting like Kahana would be made a partner, since he had hit all of the benchmarks in the Employment Agreement. In a text from November 2, 2021, Kahana wrote to F. Nesi: "Hi Frank. I'm getting a bit antsy about the partnership question. Any update?" To which, F. Nesi responded: "Yes[.] We've had a lot of discussion[.] I'll see Evan on Thursday and remind him it's time to move forward[.] We've had so many things going on." To which, Kahana responded "I need to know that I'm part of the long term plan." And to that, F. Nesi responded: "Understood I'll push this[.]" (**Exhibit 11**).

43.     On Wednesday November 17, 2021, at 5:00 p.m., Kahana and F. Nesi held a phone conversation in the evening. During this conversation, F. Nesi informed Kahana that he will not be made partner. Instead, F. Nesi told Kahana that he will give him the advice that he would give if Kahana were his son, which is to start his own practice independent from COFPS, where he can have the kind of practice that

he wants, and he can affiliate with COFPS for the purpose of fellow training, call, etc.

44.     On Friday November 19, 2021, at 4:30 p.m., Kahana and Black had a phone conversation in which Kahana shared what F. Nesi told him. Black reiterated the same position, namely that Kahana should start his own practice, and COFPS will help him get set up. Black further shared that he himself had wanted on at least a couple of occasions to leave COFPS to start his own practice because of internal disagreements.

45.     While Black believed that he could never leave COFPS, he told Kahana that Kahana would actually be living Black's dream of being independent. The conversation ended with Black promising that COFPS would assist in any way possible and would look to affiliate for the benefit of patient care and the education of the trainees.

46.     On December 15, 2021, J. Nesi wrote to Kahana claiming, for the first time, that Kahana owed a "$280,000 debt" to COFPS and asked if Kahana intended to get "a startup loan to pay off this amount." J. Nesi and COFPS did not provide any accounting or support for the alleged debt.  COFPS took the position that it would withhold Kahana's wages in order to repay COFPS the alleged "debt." (**Exhibit 12**).

16

47.   On January 25, 2022, Kahana sent a letter through his attorney advising that refusing to pay wages would be a violation of law, and summarizing some of the breaches of the Employment Agreement by COFPS, including the failure to provide an accounting for the alleged debt or pay Kahana compensation owed, and the failure to make Kahana eligible to become a partner. (**Exhibit 13**).

48.   Two days later, Kahana received a letter from ASOPRS stating that: "We have been made aware of a change in your oculofacial plastic practice that may affect your ASOPRS fellowship training program" and that the "change requires that the program be placed on automatic probation." What information was provided, and by whom, was not made clear. Black, however, is the Executive Secretary of ASOPRS, and appears to have communicated to ASOPRS that Kahana was leaving COFPS before it happened, and in retaliation for the letter sent by Kahana's attorney two days earlier.

49.   On information and belief, by the end of 2021, Kahana's efforts over less than two years resulted in collections of at least $1,689,426.43.  COFPS retained at least $1,160,195.30, or approximately 68% of the amount collected by Kahana.

50.   On the date of the next payroll on January 31, 2022, COFPS did not pay **any** wages to Kahana.

51.   In response, Kahana sent a letter through his attorney on February 1, 2022 stating that Kahana "did not receive any payment for wages earned and due to

be paid on January 31, 2022." J. Nesi had texted Kahana stating that COFPS collected $126,000 for Kahana's work in December 2021, which meant that COFPS owed Kahana about $56,700 in wages. (**Exhibit 14**).

52.     On February 4, 2022, Kahana filed an arbitration demand pursuant to the Employment Agreement. (**Exhibit 15**).

53.     After the arbitration demand was filed, COFPS paid Kahana minimum wage on February 4, 2022, and pocketed the rest of the money collected for work performed by Kahana. The February 4, 2022 paystub states that Kahana was paid $10 per hour, for total gross wages of $3,520 for 352 hours worked. The net pay, after medical deductions, was $1,210.06.

54.     On February 7, 2022, COFPS installed several camera/microphone recorders in Kahana's office in Livonia, also in violation of Michigan law and federal law on information and belief.

55.     On Friday, February 18, 2022, COFPS terminated all of Kahana's staff via email. This was done before a holiday weekend, and at a time when COFPS knew that Kahana was out of town on a preplanned trip. The email to Kahana's staff from J. Nesi stated that: "As of 5 p.m. today, all of your positions have been eliminated from the company." It continued by explaining that: "We will need you to return any files, charts, paperwork and all work product to the Livonia office on Monday." Notably, Monday was President's Day. The letter continues:

Finally when you have dropped everything off, please leave your keys and the items at the tech station in Livonia. If no one is there, you can safely exit through the back door and it will lock behind you. Please do not remove any items from the office while you are there, including any instruments you believe belong to Dr. Kahana. You will be invited back to gather your things in the coming week with the proper protocols if necessary[.] Please follow these directions carefully to avoid any potential legal issues – these things will be worked out between the practice and Dr. Kahana, and I don't want you having problems getting caught in the crossfire.

56.    COFPS concluded by stating that "I will be leaving your emails open through the weekend should any correspondence need to take place. I wish you all the best of luck in your new career paths . . ." *Id*.

57.    On the same day, at 4:41 p.m., J. Nesi emailed Kahana on behalf of COFPS and stated that:

I'm writing to inform you of some scheduling changes we are making to your clinics.
**Effective next week, starting with your Livonia clinic on Tuesday, February 22nd, all new patients will be removed from your schedule and patients will be offered appointments with other practitioners.  Rechecks will be examined with physician guidance, but most of them will have their care diverted as well**, though some will continue to see you. (emphasis added)
. . .
Furthermore, given the changes to your clinical schedules, **the positions currently occupied by Kristin Brilla, Tatiana Castro and Donna Novak have been eliminated, and as of 5 p.m. Friday February 18th are no longer employed by the practice**.  They have been ordered to return all work product, equipment and keys to Livonia on Monday.  They are to have no access to any of our patient charts, names, or any other Hipaa protected information. (emphasis added)

(**Exhibit 16 at p. 3**).

19

58.     In response, Kahana wrote to J. Nesi on February 20, 2022, stating:

I received your email dated February 18, 2022, terminating all support for my clinical practice.

The lack of support for my clinical practice constitutes a breach of contract that makes it impossible to deliver high quality patient care. In light of COFPS's refusal to pay my wages, which is also a breach of contract, and the ongoing harassment of myself and the people who have worked with me, I consider the above-mentioned email to be a termination notice. Hence, my last day of employment at COFPS was February 18, 2022.

*Id.* at p. 2.

59.     COFPS refused to participate in the arbitration, refused to pay the AAA arbitration fees, and indicated that it would not proceed in arbitration.  (**Exhibit 17**). No fees have been paid since AAA demanded fees be paid by March 17th.  On March 1st, COFPS, through counsel, advised Kahana that it would not pay the arbitration fees, and demanded that Kahana dismiss the arbitration.  As a result, Kahana had no choice but to file the instant action.

## COUNT I
## VIOLATION OF FAIR LABOR STANDARDS ACT
## (ALL DEFENDANTS)

60.     Plaintiff incorporates by reference paragraph 1 through 59 as though fully set forth herein.

61.     Plaintiff was paid pursuant to a formula set forth in the Employment Agreement between the Parties that Kahana would receive his collections less overhead. (**Exhibit 3**).

62.     COFPS collected, on information and belief, at least $1,689,426.43 from February 1, 2020 – December 31, 2021.

63.     Pursuant to the formula in the Employment Agreement (as amended), Kahana should have received 55% of his collections, or $929,184.52.

64.     Instead, Plaintiff only received $529,231.12 because COFPS did not pay Kahana's full wages in violation of the Fair Labor Standards Act including, but not limited to 29 C.F.R. 541.603.

65.     In further violation of the Fair Labor Standards Act, COFPS was required to keep records including itemized accounts showing the nature and amount of any expenditures made on Kahana's behalf in violation of 29 C.F.R. 516 and 29 C.F.R. 516.27.

66.     Kahana has made multiple requests for the records supporting the calculations of his wages and overhead, but COFPS has refused to comply with his requests.

67.     In further violation of the Fair Labor Standards Act, in the payroll for collections during the month of December 2021, COFPS withheld ALL of Kahana's wages, which should have been paid on the regularly scheduled pay date for the

month on January 31, 2022.  Kahana received no payment whatsoever on January 31, 2022, the regularly scheduled pay date.

68.     Kahana should have received wages in the amount of $56,700, according to COFPS' assertion of the amount of Kahana's collections. COFPS withheld his wages in violation of 29 U.S.C. § 203 *et seq*.

WHEREFORE, Plaintiff requests that an award be entered by this Honorable Court in whatever amount he is found to be entitled, plus liquidated damages, exemplary damages, costs and attorney fees and such other relief as is just under the circumstances.

## COUNT II
## RETALIATION IN VIOLATION OF THE FLSA and MICHIGAN COMMON LAW
## (ALL DEFENDANTS)

69.     Plaintiff incorporates by reference paragraphs 1- 68 as though fully set forth herein.

70.     The FLSA applied to Plaintiff's employment with Defendants at all relevant times.

71.     Section 215(a)(3) of the FLSA, 29 U.S.C. 215(a)(3), prohibits retaliation against an employee because he has filed a complaint or instituted any proceeding under or related to the rights contained in the FLSA.

72.     On or about January 25, 2022, Kahana, through counsel, sent a letter to COFPS complaining about its wage practices and threats to withhold Kahana's January wages altogether.  (**Exhibit 13**).

73.     Plaintiff's letter constituted a complaint and was protected activity under the FLSA.

74.     As a direct and proximate result of receiving Plaintiff's demand letter for records and redressing wage violations, COFPS engaged in a series of retaliatory conduct that include, but are not necessarily limited to the following: misrepresenting the status of Kahana's practice and status with ASOPRS; and withholding all of his wages on the regularly scheduled payroll date of January 31, 2022.

75.     On February 4, 2022, Kahana filed a demand for arbitration pursuant to Employment Agreement. (**Exhibit 3**).  Defendant COFPS refused to pay the fees required by AAA and refused to participate in Arbitration. (**Exhibit 17**).

76.     In further retaliation for engaging in protected activity, COFPS made a small, partial payment of Kahana's wages on February 4, 2022; installed cameras with the intent to harass and surveil Kahana; terminated his staff; withheld resources necessary to conduct his surgeries and provide patient care; rescheduled his patients and ultimately terminated him on February 18, 2022.

77.     These retaliatory actions were taken as a direct and proximate result of Kahana's complaints to COFPS and his demand for arbitration.

WHEREFORE, Kahana requests that this Honorable Court enter judgment in his favor in whatever amount and form he is found to be entitled, including exemplary and punitive damages and costs and attorney fees incurred in bringing this action.

### COUNT III
### ACCOUNTING STATUTORY AND COMMON LAW
### (COFPS)

78.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1-77 as though fully set forth herein.

79.     The Parties financial arrangement included mutual transactions whereby Kahana would perform surgeries and other medical services, and the funds collected from Kahana's services would be paid back to Kahana less the agreed upon overhead.

80.     COFPS has failed and refused to provide documentation supporting or substantiating the amounts claimed by COFPS for overhead, its alleged "loan" and other costs it attributed to Kahana, and has on information and belief, substantially overcharged Kahana.

81.    The transactions between the Parties are sufficiently complicated that discovery alone will be inadequate to redress Kahana and an equitable accounting is necessary due to the fraudulent conduct by COFPS.

WHEREFORE, Plaintiff requests that this Honorable Court enter an order requiring an equitable accounting of Kahana's collections and the expenses charged by COFPS and order judgment in Kahana's favor in whatever form and amount he is found to be entitled, plus interest costs and attorney fees.

**COUNT IV**
**BREACH OF CONTRACT**
**(COFPS)**

82.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1-81 as though fully set forth herein.

83.    The Parties entered into the Employment Agreement on February 14, 2020.

84.    COFPS breached the Employment Agreement in the following particulars, including but not limited to:

- Refusing to pay Kahana wages due, including for collections received in December 2021, January and February 2022, and thereafter. COFPS continues to receive money from insurance for work performed by Kahana but is pocketing all of it.

25

- Refusing to "provide and maintain or cause to be provided and maintained such facilities, equipment, clerical and other employees and supplies as it deems necessary for the performance of services by Employee under this Agreement. Employer agrees to provide any surgical instruments Employer deems necessary not provided by any hospital in which Employee performs surgery on behalf of patients of Employer. Employer and Employee may reach a consensus about the items necessary to conduct Employee's practice prior to reaching this Agreement as attached on Exhibit C."

- Refusing to provide accounting or backup support for calculation. COFPS is even unwilling to provide the Billings and Collections report showing how much has been collected for work performed by Kahana.

- Refusing to pay the employees listed on Appendix B, thus forcing Kahana to pay them out of his own pocket. And when COFPS did pay them, COFPS calculated this as an additional expense beyond the 55% "overhead" calculation, in direct contradiction of the Employment Agreement.

- Not providing a loan, as required under Section 1, despite having Kahana sign a Promissory Note.

- Refusing to make Kahana eligible for partnership upon hitting his benchmarks, as required by Section 13.

- Refusing to provide the items listed in Exhibit C, including the failure to pay the P.A. Salary base or for the P.A. Staffing, removing Kahana from the website, and failing to include Kahana in Mailings/Marketing.

- Failing to provide Kahana with personnel support, despite charging for overhead.

WHEREFORE, Kahana requests that this Honorable Court enter judgment in his favor in whatever amount he is found to be entitled including costs and attorney fees, along with an equitable accounting of the parties' financial relationship.

## COUNT V
## FRAUDULENT INDUCEMENT
## (DEFENDANTS NESI, BLACK)

85.     Plaintiff incorporates by reference Paragraphs 1-84 as if fully set forth herein.

86.     F. Nesi and Black fraudulently induced Kahana to terminate his tenured position with the University of Michigan, and join COFPS as more fully set forth in Paragraphs 15 through 18 above.

87.     Kahana reasonably relied on F. Nesi and Black's representations and joined COFPS in February 2020.

27

88.     Black and F. Nesi's misrepresentations were material and were made to induce Kahana into terminating his employment with the University of Michigan and joining COFPS.

89.     Kahana has been damaged as a result of the misrepresentations.

WHEREFORE, Plaintiff requests that this Honorable Court find that the Employment Agreement is voidable at the election of Plaintiff as a result of the misrepresentations and enter such other relief as the court deems appropriate under the circumstances including interest, costs and attorney fees.

## COUNT V
## UNJUST ENRICHMENT
## (ALL DEFENDANTS)

90.     Plaintiff incorporates by references paragraphs 1-89 as though fully set forth herein.

91.     Kahana conferred a benefit on the Defendants by performing services upon which funds have been collected.

92.     Kahana's services between February 2020 and February 18, 2022 will amount to collections well over $2,000,000.

93.     COFPS improperly withheld funds and improperly withheld services and the tools of Kahana's trade at various times over the course of his employment with COFPS.

28

94.     Kahana's collections for work performed through February 18, 2022, which will continue to be collected for several months, results in a benefit that would be unjust for the Defendants to retain.

WHEREFORE, Kahana requests that this Honorable Court enter judgment in his favor in whatever form and amount he is found to be entitled, plus interest, costs and attorney fees.

Respectfully submitted,

HOOPER HATHAWAY, P.C.

Dated: March 25, 2022          BY:   /s/Angela L. Jackson
Angela L. Jackson (P53930)
126 South Main Street
Ann Arbor, MI  48104
(734) 662-4426
ajackson@hooperhathaway.com
Attorney for Plaintiff

29

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.


Respectfully submitted,

HOOPER HATHAWAY, P.C.

Dated: March 25, 2022            BY:   /s/Angela L. Jackson
Angela L. Jackson (P53930)
126 South Main Street
Ann Arbor, MI  48104
(734) 662-4426
ajackson@hooperhathaway.com
Attorney for Plaintiff